Our second case for this morning is Bulk Petroleum v. Kentucky Department of Revenue. So when you're ready, whoever's first up. Mr. Kirkman. Thank you, Your Honor. Good morning. My name is Jerome Kirkman. May it please the Court. Kentucky's position requires that the Court rewrite Kentucky statutes in three ways. We believe they are trying to avoid the fact that Bulk was the actual payer of the tax. No one disputes that the cash came out of Bulk's pockets and found its way into Kentucky coffers. The way the Court must rewrite the statute in this case so that Kentucky would win is first to insert a word license before the word dealer in Section 138.210A. And Kentucky concedes this on page 22 of their brief. The Court must also delete the phrase to enforce the duty of the dealer to collect the tax out of 138.210A. And the Court must read out of the statute the fact that a dealer, such as Marathon or BP, is acting as a trust officer. The facts in this case are extremely simple. Bulk buys gas from BP or Marathon. It orders the gas. It goes up to terminals in Kentucky. BP, Marathon load the gas into Bulk's trucks. And Bulk's trucks then either deliver the gas in Kentucky or outside. In this case, the issue is the trucks at issue went up to either Indiana or Tennessee. So let me ask you this question. Under the relevant Kentucky statutes, when Marathon or BP gets gas and puts it in the terminals in Louisville, is that quote, receipt, close quote, or does receipt happen only when it is loaded onto the tanker trucks? Judge, I think that question is answered in 138.210A. And if you look at the words, and I hate to read statutes and walk you through them, but in that case it specifically says that the gas is not received until it has been loaded for Bulk delivery. So in other words, from the point of view of Marathon and BP, you couldn't say that they incurred a duty to pay this tax when the gas gets delivered to the terminals from some place. It's only when it gets loaded on. I understand your argument to be that it's clear that it's not BP or Marathon's tanker trucks, it's Bulk's tanker trucks. Yes, and actually within I think the first sentence of 210A, it states that it's received, quote, when it has been loaded for Bulk delivery. And earlier in the sentence it talks specifically about being in refineries. That statute is right on point. But even if they, Kentucky tries to use sub B, which is a negative, to sort of change the meaning of that statute. I would point out that even if Bulk. The last sentence of sub B, right, is what they're focusing on. Actually, I think the last, the first sentence they agree doesn't apply, but it's the last two sentences that apply. But even if you find that for some reason BP or Marathon actually was received, deemed received under their reading, that still does not avoid the issue of whoever pays the tax can seek the refund. So your theory is simply, I'm looking at an invoice from, I'm assuming this is from January 7, 2007, although it says 2007-01-07. So this is inside the period of time that Bulk was unlicensed. And there is a line item on this invoice that shows $1,468.21 Kentucky gasoline tax. So that's the tax. This happens to be a Marathon invoice that Marathon paid, but paid under a duty to transmit along to the Kentucky Department of Revenue. Yes, Your Honor. And, in fact, there's even another situation, and it's in the record. It's your doc at 52-2 at 366. There's a situation where either BP or Marathon actually sent Bulk an invoice for $26,000 because they had not added the tax on earlier. They hadn't quite caught up with the fact that the license had been pulled, and therefore they were supposed to add the tax. So they sent an invoice for $26,000 just for tax, nothing else. So it's inconceivable how you can argue, well, it's simply an add-on to the price because there was no gas being transferred. It was we didn't collect the tax, we need to do it. Mr. Kirkman, I'm struggling with appellate jurisdiction here. Yes. If I read, for example, footnote 2 of your brief, which is at page small Roman 12, if we were to affirm you want to go back to the bankruptcy court and litigate the constitutionality of the interpretation of the statutes that would result in affirmance, correct? Actually, Judge, I understand where you're going with that, and we hedged in our brief. We hedged in, I think, the earlier pleadings. Let me be clear. We believe at this point, after having reviewed it and given it additional thought, we believe the jurisdiction is final for this reason. Judge Clavert in the district court ruled that Bulk never paid the tax. If Bulk never paid the tax, I don't believe Bulk can argue the constitutionality of it. So, therefore, I think the bankruptcy court would be required to simply say there was no tax paid, you don't have a constitutional argument. Do you concede you don't have a constitutional argument? We don't, based on the law of the case, based on how Judge Clavert has ruled. Wait a minute. So are you waiving any constitutional claim if we were to affirm Judge Clavert on the merits? The answer is the law of the case would require us to waive that. I'm not saying we waive it. No, we're either yes or no. We don't have that argument if you affirm. Yes. Yes, I will admit we do not. You are waiving any constitutional claim if we affirm. Yes. So that all the bankruptcy court would have to do is enter judgment for the Kentucky Department of Revenue. Yes. And you're not going to argue, as you said in your brief, that you want to ask the bankruptcy court to examine the legal determinations that it made that were overturned by the district court? That is correct. I don't believe we have the ability to do that. Well, that's certainly a surprising turnaround. I have a different question about what you are doing or not doing. Has Bulk ever asked Marathon or BP to file refund applications with Kentucky? No. Why not? The way Kentucky reads the statute, the way the district court read the statute, the right person to seek a refund is Marathon. Yes. So presumably Bulk goes to Marathon, says, we have the proof that the following shipments went out of state, asks Marathon to file a refund application and remit the proceeds to Bulk. Why isn't that the right way to go about this? Judge, I believe the reason is because when Bulk, this is pre-bankruptcy before my involvement,  that's how Bulk anticipated to go forward. Bulk didn't understand that there was that item. Fine. Bulk read the email or misread the email. That's long, long ago. I'm asking why you or your predecessor in this bankruptcy case, why the lawyers didn't say, okay, person who paid the tax is Marathon. Dear Marathon, please file a refund application. Here are our documents on which that application can be based. I need to double check, and I'll come back and rebuttal and answer it this way. I think the four-year statute limitation may have run on Marathon and BP at that point. Bulk would have gotten the benefit of having filed bankruptcy and extended that. If the statute of limitations is run on Marathon, why hasn't it run on Bulk? Well, Bulk filed refund claims in 2007 and 2009 within the statute, I thought. I believe they did. But at that point in time, Bulk didn't know that Kentucky was going to make this argument. No, I understand. I'm just saying the reason the statute hasn't run on Bulk is because Bulk did file. Yes. I need to give time to my other people. All right, that's fine. Mr. Laywell. Good morning. May it please the Court. My name is Fran LaWall. I'm an attorney with the law firm at Pepper Hamilton. My firm represented the official committee of unsecured creditors in this case, who were of multimillions of dollars when the Bulk case began. Your Honors, we believe this as being a very simple issue, and that is whether the KDR is permitted to retain significant amounts of tax paid on product that was admittedly shipped out of the state. The what? Excuse me? The what? Could you? You may have said KDR. Oh, I'm sorry. It's not a word. I'm sorry. And we're not Kentucky tax specialists. If you'd use real English words, I think that would help us follow you. I appreciate that, and I apologize, Your Honor. The Kentucky Department of Revenue, whether they are entitled to retain tax proceeds on product, which admittedly was shipped out of state, and which they say in their own briefs, which there is no effective mechanism for purposes of obtaining a recovery. Within their own briefs, they admit that either BP or Marathon would have no idea whether product was shipped out of state. Why would they have no idea? Bulk presumably has records, the very records that, in this case, Bulk wants to use to obtain money from Kentucky. Why can't Bulk furnish those records to Marathon and ask Marathon to file a refund application in Kentucky? And that is a fair question. I think the practical answer is this. The way that the sale of multimillions of dollars of product occurs is that they bill for the price of the product itself and they bill for the tax, as indicated within the invoices. So your theory is, at least the theory of everybody on this side of the courtroom, is that neither BP nor Marathon has any interest in this tax money. They are, in fact, agents of the state, and so they wouldn't be saying, pay us back. Not only that, within the brief, the Kentucky Department of Revenue indicates that they would have no obligation, even if that refund were requested, to pay it to Bulk. So it's really three steps. To pay it to Bulk or to pay it to BP or Marathon? No, that if BP or Marathon were to seek a refund, and if they were successful in obtaining that refund, they would have no obligation to pay that refund. They could just keep the money. Exactly. So, effectively, what occurs is that what the Kentucky Department of Revenue would like this court to believe is that Marathon or BP would seek a refund for product which it has already been paid and then keep that. And we believe, within the commercial industry, that's not going to occur. Now, a couple other points, if I may. Okay, you're in your ñ I'll give you a minute to make a point. Thank you. I appreciate that courtesy. Mr. Kirkman has indicated that the Kentucky Department of Revenue's argument really hinges on whether they receive the ñ whether Bulk receive the product or Marathon or BP receive the product. We believe, regardless of how that comes out, the structure of the Kentucky statute, and if I may point out, in particular, Section 138.2711B provides a 2.25 percent fee to the licensed dealer for purposes of collecting the fee. And respectfully, we would request, or we would ask, if such a fee was being paid and it was not acknowledged that this tax was being passed on to the dealer, why would that fee be necessary as opposed to simply reducing the tax burden rather than putting a fee in there? And also, as pointed out in the briefs, it shows where the licensed dealer is listed as a trust officer and is also authorized for purposes of collecting the tax. And we have seen that the invoices show that a separate line item is there for the tax. And again, the Kentucky Department of Revenue indicates that there is no economic incentive for the licensed dealer to collect the tax. Based on all of that, we believe, Your Honor, that the taxpayer was, in this case, bulk and that they are entitled to the refund. And thank you for the courtesy of the extra time. All right. Thank you very much. Mr. Corcoran. Thank you, Your Honor. Ed Corcoran, representing the Bank of Sun Prairie and intervening appellant. I guess one of the things my client wanted to bring to the attention of the court is that we really think the court should look at who the real aggrieved parties are in this litigation in the sense of who bears the consequence of the Kentucky Department of Revenue if they are able to keep this tax revenue that was collected for a purpose that was not intended by their statute. Their statute was intended to collect taxes for gasoline that was used in Kentucky. This gasoline wasn't used in Kentucky. And if they're able to prevail here and not have to refund these taxes, my client, who issued a letter of credit to support the fuel bond that was put in place after the period of license revocation, ends up being the party that will be on the line for a million dollars for taxes. And the letter of credit and the fuel bond were there to support and make sure the taxes were paid. The taxes were paid. But now that they're not paid, if Kentucky gets to keep the tax revenue for fuel that wasn't consumed in Kentucky, my client, a small community bank, gets hit for a million dollars. The creditors of the bankruptcy estate who are out millions of dollars, a portion of the money that would otherwise be available for them, that's the real aggrieved parties in this situation. If Kentucky can keep taxes, it was never intended by the scheme of their tax statute for them to be able to keep taxes for fuel that wasn't consumed in Kentucky. Okay. Thank you very much. Thank you. Mr. Dempsey. Thank you, Your Honor. My name is Frank Dempsey. I represent the Kentucky Department of Revenue, and I'm here with Mr. Campbell Connell. He's my co-counsel and will address the second half of our argument. The main point of our argument today is the district court got it right. The district court was able to elucidate Kentucky's fuel taxing scheme much better than we were, in fact. But, you know, here's the problem. Under the district court's view, nobody ever paid any tax to Kentucky. BP and Marathon just raised the price by a certain amount, roughly 9%, because that happens to be the tax amount. And BP and Marathon collected that money, and they never received under the statute any gasoline in Kentucky. They certainly didn't receive it when it went into Bulk's trucks, and they didn't receive it when it went to their terminals. And Kentucky winds up $1.2 million in the black. And it's a disturbing theory for me, since it clearly is indicated to be taxed on the invoices, and it didn't stay in Kentucky. I mean, you've taken something like the licensed dealer status, which gives the tremendous benefit of being able to net things out every month, as opposed to being unlicensed, and you've blown it up into a windfall for the state. Well, Your Honor, I don't believe it's a windfall. I'm sure it is, because this gas went to Indiana and Tennessee. You're just collecting sales tax on, or whatever this tax, whatever you want to call it, this oil tax, gasoline tax, on fuel that you didn't have a right to tax. Your Honor, I believe that the taxable event, the incidence of tax, occurs when the licensed dealer transfers it away to an unlicensed party. What statutory language are you relying on for that? I believe that both sections of 210 sub 5 would cover that situation. That's the triggering event, when the licensed dealer transfers to somebody who's unlicensed. And Bulk has made much of the fact that they didn't have any mechanism to recover this money. They did have a mechanism to recover this money. They could have kept their license. They knew they needed a license. Well, but suppose they didn't. What about Judge Easterbrook's theory? Your brief makes me think that you think that wouldn't work, because, first of all, Marathon and BP are under no legal obligation to file a refund on Bulk's behalf. They might do it if they were in a nice mood that day, but they're not out any money. Indeed, they've gotten this 2.75% benefit for collecting the tax on Kentucky's behalf. And even if they were inclined to respond to a request like that, they're equally under no legal obligation to pass back to Bulk whatever they receive as a refund. I don't believe that they're under any statutory obligation under the Kentucky fuel tax law to do so, but they may be under a common law obligation or some other legal obligation. What common law obligation? Unjust enrichment. They've received money that they don't deserve. Well, they aren't enriched. They've actually paid the money to Kentucky. Correct. They would probably be in trouble if they filed a refund application and didn't turn the money over to Bulk. Yes. Then you have an unjust enrichment situation. That's the situation I was referring to. Perhaps I should have asked Mr. Kekman. Do we know whether there was a contract between Marathon and Bulk in which Marathon agreed with Bulk to file a refund application, if asked? I have no information. Right. As I said, you're probably the wrong person to ask this question to. I'll ask Mr. Kekman when he gets back up. My guess is that there's probably no such contract, at least in this record, because I feel that somebody would have mentioned it. But it's a disturbing theory, frankly, that you have, and since this is really all about how these various Kentucky statutes interact with one another and your brief is one of the most apologetic briefs I've ever read about how this evolved, it seems to me if we're in the realm of equity and unjust enrichment, maybe there's some equity here on Bulk's side as well. They thought that they were dealing with a system under which, while they were unlicensed, BP and Marathon had a duty to collect the tax. They did collect the tax. They dutifully remitted it to Kentucky. Then Bulk gets its license back. It gets this message from KDOR saying, okay, now you can file for your refund because you're back in good financial standing. They pay a lot of money to get the license back. It seems to me that's a quite rational reading, less strange reading of the statutes than yours. Well, I would suggest that Bulk knew all along what was required for it to obtain a refund. It was familiar with the statutory scheme and the actual working of the Kentucky statute. Well, you didn't know all along. Bulk? At least some of your employees didn't know all along since they were saying something different. The people you were representing were telling Bulk, which was maybe foolish to listen to them, but they were telling Bulk, here's how you're supposed to go about this. During this period of time that no one knew ex ante how long it was going to go that you don't have a license, you have to pay the tax up front, and you've got to do it through your supplier because they're licensed. Once you get your license back, you'll be back in good standing. You can be back in the situation where you can net it out, and you can also get a refund for taxes that you didn't have to pay. Because the statute sometimes uses the term licensed dealer, often uses the term dealer, and in one critical place it uses the term dealer or other person. So you read it as though it always says licensed dealer, but it really doesn't. Well, we believe that that's the primary purpose of the statutory scheme is to administer it. It might be a purpose, but if the statute is singling out all dealers, licensed or unlicensed, or any person, then it really isn't the words that your legislature chose to use. They didn't say only licensed dealers, except when they meant to say only licensed dealers. Well, we believe that the system provides a mechanism for Bulk to have received those refunds. How do you think, if you were advising a bulk of the world today, the ABC company, who loses its license, what do you think, under your theory of these statutes, should happen? Under my theory of these statutes, that company, if it wants to avoid paying Kentucky taxes, should not buy fuel in Kentucky. It should buy fuel in the states where it is licensed. So, in other words, there's absolutely no system other than boycotting Kentucky. And if they do, they're just going to have to pay double gasoline taxes, once to Kentucky and once to the state where it's distributed. Despite the law that seems to indicate that's unacceptable. Or comply with our licensing requirements, which is the purpose of the licensing requirements in the first place. That's not what the statute says. The statute clearly seems to indicate that some dealers are non-licensed dealers. They're still dealers. They're dealers, but they're required to pay the increased price, and only a licensed dealer can apply for a refund. Boy, it doesn't. I'm having trouble finding that part of the statute. I would also like to address one of the things that Mr. Corcoran said about the equities and the creditors. The creditors, the bankruptcy creditors, which this refund would be divided amongst, and Kentucky is also, has its own proof of claim for other taxes. The other creditors chose to do business with Bulk. Kentucky did not. Kentucky takes all comers. If it's a question of equity between creditors, we feel that Bulk has more responsibility. The other creditors have more responsibility since they chose to do business with Bulk. They made a poor business decision regarding operating in Kentucky. Okay. So is Mr. Connell going to present something? Thank you, Your Honor. May it please the Court, I have a number of points to make. I first wanted to address a couple of, clarify a couple of things I believe the Honorable Chief Judge brought up. First, at one point the Chief Judge made the statement that BP and Marathon didn't receive the gasoline or pay the tax. And that wasn't, in our opinion, the view of the district court or, in our opinion, the view of our view of the Kentucky statute. When Marathon and BP loaded the gas onto the tank trucks of Bulk in the state of Kentucky, 138.210.5A says that they received the gas. No, they didn't receive anything. The statute also may cover transport, may cover transfer. But it's absurd to say that if I give something to you, I have received it when you take it. Your Honor, 138.210.5 defines the term received. It's not a common meaning of received. It's a technical term. And to determine what received means, you have to look at that particular statute. I am looking at the statute. It says it's received when it's loaded into the tank trucks. 138.210.5A. It goes through all this thing, deemed to be received when it's been loaded for bulk delivery into tank cars consigned to destinations. But it doesn't say who the loader receives it. It says the tank car receives it. If BP or Marathon was putting it into its own tank car from the terminal, I would say it's received. Well, 5A goes on to say that for the purpose of proper administration, it is presumed that gasoline and special fuel loaded by the licensed dealer within the state. It's consigned to destinations in the state. That's what that sentence is about. Unless the contrary is established by the dealer. Where it's going, that's not who receives it. It's an absurd argument to say that BP and Marathon received at the moment they transferred to bulk. Okay. One of my points there was the statute doesn't define delivery into the terminals as received. No, it defines it when the terminal facility loads into the tank cars. Right, right. And that's when the terminal facility is liable for the tax. So if the statute had said at the moment that BP or Marathon puts it into the terminals in Louisville, it's received in the state of Kentucky, you know, I might be willing to go with that. It's something that means something. But to say that when BP Marathon moved it from the terminals into some other company's tank cars, it's the original holder of the gas that receives it is not what I read the statute to say at all. Well, I respect Your Honor's opinion and just respectfully disagree. I think the statute, Marathon and BP, the licensed dealers in this practical circumstance, are the ones that are paying the tax and filing their terms. I'm going to tell you this is one of the vices of using the passive voice, because you have in fact said deemed to be received, but by whom? And that's what you don't say. That's well taken, Your Honor. In terms of another point I want to make that's relevant to this is that there is some of this broad collect and remit language that goes very carefully in our brief through the terms collect and remit as they're used in the sales tax and the withholding tax arena, where it's clear that one person is collecting an amount from one person giving it to the state. That's not at all the case here. These are different statutes, but I was not overwhelmed by that argument. The sales tax has the merchant collecting from the consumer and remitting to the state, but if BP and Marathon didn't collect any tax from bulk, the state reserves the right to go directly to bulk to get that tax. No, we don't. It's jointly and severally liable. No, only if bulk had somehow failed to comply with all the Kentucky statutes and regulations under 138224 would they be liable, and they didn't. They bought from a licensed dealer. They weren't under any liability to pay any tax whatsoever. Wait a minute. So you're telling me that you think that if this invoice didn't have a line for Kentucky gasoline tax and Kentucky somehow got wind of the fact that gas is moving through Louisville into bulk trucks and going to Tennessee, which this particular one is going to, that it's not legally entitled to go after bulk tax? Absolutely. In fact, if you look at the post-August 2007 period, bulk got its license back. After that point, bulk was responsible itself for paying the taxes. It didn't do that. It broke the law. That is why the representative of the bond company is here. We haven't gone after the downstream purchasers from bulk. We've just looked to the bond company because that's the way the Kentucky statute is set up. Now, Your Honor, there was another point where you had mentioned that we were reading the statute to say, well, dealer always means licensed dealer. And to be honest with you, that is a problem we got into in the bankruptcy court because we weren't thinking of the full effect, and that's why we were thrown off when bulk brought up the definition of dealer in the oral argument for the bankruptcy court that they'd never brought up before. In fact, we think that the way to read the statute is that dealer can apply to an unlicensed dealer in the case where the unlicensed dealer is trafficking in untaxed motor fuel, and we have to go in and audit that. What about the honest unlicensed dealer that is working with a company like BP or Marathon that the tax is being paid? And your people said you could ask for a refund after you've done your business act. We said the consideration would be given. This issue has never come up. I said you could ask for. I didn't say you'd give it. Yeah. This issue has never come up before, and these statutes are very complex. You know, I was in an IRS litigation once where the IRS conceded the night before the U.S. tax court hearing, not because they thought they were wrong on the issue of law, but because the agent had made all the adjustments in a way that were inconsistent with the IRS's own detailed procedure for doing so. Sometimes these things happen. It's embarrassing when we make a mistake. I think there have been other cases made by Bolt. In this case, mistakes made by Bolt. It just happens. What about the argument that the unsecured creditors are out, the $1.2 million that shouldn't have gone to Kentucky because this gas was consigned for use outside of Kentucky? Well, our argument is that Bolt never paid any taxes to the state of the Kentucky. Marathon and BP did. Somebody did. Marathon and BP paid the taxes, yeah. Right, and so they – and the gas, according to you, was received by BP and Marathon when it went into Bolt's trucks and then was consigned for being outside of the state. So BP and Marathon shouldn't have paid either. The unsecured creditors are – Well, Marathon and BP, that would be an issue between Bolt and Marathon and BP, and that's a different issue than the one we have in front of this court. Maybe. I think that the tax law – If you can just wrap up, that would be great. My view is that this is a very technical and complex area. I think it really requires close inspection of the briefs and the statutes in order to answer it. Just to bring up one final thing, in 5B, I wanted to explain, the final two sentences of 210-5B refer to license dealer to license dealer sales. We discussed those in the context of our brief because that was what was relevant before Bolt lost his license and after Bolt regained his license, and we were trying to present a holistic picture of how Kentucky tax law operates where in practical reality everything is related to the license dealer unless someone is breaking the law. Bolt tried to say that 5B – Okay. Thank you, Your Honor. Thank you very much, Mr. McConnell. Anything further, Mr. Kirkman? I think you did save a little bit of rebuttal time. Yes, Your Honor. Briefly, and I'll try to address Judge Easterbrook's issue about the contract. The contract is not on the record, and I haven't read it so I can even opine on it. It's just not in the record. I would also point out on page 24 of Kentucky's brief, they state under Kentucky statutes in no uncertain terms that even if BPM Marathon had obtained a refund, they would have no duty or any reason to pay anything to Bolt. Finally, I think the whole licensing issue is really credit terms. If you get credit terms and you show the bond and you're creditworthy, then you have the ability to pay a month later and you get some other benefits. When you're not licensed, you're not a lawbreaker. I mean, Bolt was submitting monthly reports. I believe it was doing what it was doing. It didn't get the benefits of a licensed dealer financially. It had to pay for them. It's paid the tax twice. It paid it to both Kentucky and it's paid it to Tennessee or Indiana. And, you know, that's a lot of money that went out and is not available to the creditors. Thank you. All right, thank you very much. Anybody else have time left? I think everyone else has used up their time. So we will thank all counsel and take the case under advisement.